1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

QUINTON P. BROWN,

7                              Plaintiff,

8          v.

9    GARY WAKEMAN, et al.,

10                             Defendants.

Case No. C18-5416-BHS-TLF

REPORT AND
RECOMMENDATION

Noted for <u>September 13, 2019</u>

11          This matter is before the Court on defendants' filing of a motion for summary judgment

12    (Dkt. 31). Plaintiff has brought suit under 42 U.S.C. § 1983 against defendants for alleged

13    violations of his First and Fourteenth Amendment rights under the United States Constitution as

14    well as the Religious Land Use and Institutionalized Persons Act (RLUIPA) related to

15    defendants' implementation and enforcement of Department of Corrections (DOC) Policy

16    560.200(vi)(D)(3)(a) which provides that "[r]eligious programs and services may be cancelled

17    and not rescheduled due to: …unavailability of the sponsoring religious faith group or a

18    designated employee/contract staff/volunteer supervisor." Dkt. 5, Complaint.

19          Plaintiff names the following defendants: Gary Wakeman, Chaplain at Stafford Creek

20    Correction Center (SCCC), Jeneva Cotton, Associate Superintendent at SCCC, Margaret Gilbert,

21    Superintendent at SCCC, and Belinda Stewart, Religious Program Manager at DOC

22    Headquarters. *Id.* This matter has been referred to the undersigned Magistrate Judge. *Mathews,*

23    *Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR

24

25

REPORT AND RECOMMENDATION - 1

1    4(a)(4). For the reasons set forth below, the undersigned recommends the Court GRANT

2    defendants' motion (Dkt. 31) and dismiss plaintiff's complaint.

3    <u>FACTUAL AND PROCEDURAL HISTORY</u>

4        Plaintiff is an inmate currently incarcerated by the Washington State Department of

5    Corrections (DOC) at the Monroe Correctional Complex (MCC) in Monroe, Washington and is

6    an adherent of Orthodox Judaism. Dkt. 5, Complaint, at 5. Prior to being transferred to MCC in

7    December of 2017, plaintiff was incarcerated at the Stafford Creek Corrections Center (SCCC)

8    in Aberdeen, Washington. Dkt. 34, Fischer Decl., at ¶ 7.

9        Plaintiff's complaint alleges defendants' implementation and enforcement of DOC Policy

10   560.200(iv)(D)(3)(a) at SCCC violated his rights under the First and Fourteenth Amendments

11   and RLUIPA by "effectuat[ing] a complete and absolute ban on any and all Jewish worship

12   services and activities without furthering a 'legitimate or compelling' penological interest. Dkt.

13   5, at 7-8. More specifically, plaintiff alleges under the policy's terms "defendants prohibited

14   [him' from: (1) engaging in pre-Shabbat and Shabbat services, (2) or, for that fact any type of

15   Jewish Religious observances, (3) possessing certain items of religious property, (4) making use

16   of grape juice (in lieu of wine) and matzah (in lieu of challah, or bread) and (5) having access to

17   reading and studying religious materials located in the Jewish locker, in P-Building, upper floor

18   – room #2210 at Stafford Creek. *Id.* Plaintiff contends defendants did this "throughout [his]

19   incarceration at Stafford Creek" before DOC Headquarters transferred him to MCC. *Id.* Plaintiff

20   also contends generally that DOC policy still applies to him at MCC although his complaint does

21   not allege any specific injury as a result of the application of that policy at MCC. *Id.*

22       Plaintiff requests declaratory relief for the defendants' violations of his free exercise

23   rights under the First and Fourteenth Amendments and RLUIPA. *Id.*, at 63-64. Plaintiff also

24   requests injunctive relief requiring the DOC to "allow him to observe Jewish Shabbat on par

25

with secular and religious [groups] … with or without an outside sponsor/volunteer present." *Id.*

Plaintiff also requests general damages in the amount of $1,00.00 with respect to each defendant,

punitive damages in the form of suspending defendants without pay, and punitive damages of

$100,000.00 jointly against all defendants. *Id.*

**A.    Religious Programming and DOC Policy**

Religious programming at DOC is governed by DOC Policy 560.200. Dkt. 35, Wakeman

Decl., at  ¶¶ 4-6, Exhibit A, DOC Policy 560.200. By policy, congregational religious services

are permitted at DOC facilities as long as there is supervision by designated employees, contract

staff, or volunteers who are not offenders. Dkt. 35, Exhibit A at 9. Specifically, DOC Policy

560.200(IV)(D) states, in relevant part:

> 2. A schedule of all available religious programs and activities will be posted in the religious service area(s), living units, and other appropriate areas readily accessible to offenders.
> ***a. Religious programs will meet with the supervision of designated employees, contract staff, and volunteers***. Facility custody level and physical plant will determine the number of supervising persons required.
> 3. Religious programs and services ***may be cancelled and not rescheduled due to***:
> a. ***Unavailability of the sponsoring religious faith group or a designated employee/contract staff/volunteer supervisor[.]***

*Id.* (emphasis added). According to Belinda Stewart, the DOC Corrections Program

Administrator, there are legitimate reasons for this policy. Specifically, she states:

> Any congregation of inmates is a threat to institutional security, but supervised inmates are less likely to engage in proscribed behavior than they would if they met unsupervised. Religious groups are of special concern to prison administrators and DOC because inmates who set themselves up as religious leaders would potentially wield more power over the members of their congregations. This power could be used to motivate followers to engage in threatening behavior such as riots and violence toward other groups of inmates. Supervision not only discourages this behavior, but it also provides a third party to report questionable behavior to prison officials.

Dkt. 36, Stewart Decl., at ¶¶8-10.

DOC Policy 560.200(III)(B) states:

> When an offender requests a religious faith practice or program *not currently being allowed/provided:*
> 1. *S/he will provide the name and address of an outside religious authority of the religious faith group to the Chaplain on DOC 21-142 Religious Requirement Information Sheet.* The Chaplain will send a copy of the form to the religious authority to complete and return, verifying the request is consistent with faith standards.
> a. The outside religious authority may not be an offender or an offender's family member and must be recognized as a religious authority within the religious faith group to which the request applies.
> 2. The Chaplain will forward a copy of the completed form to the Headquarters Program Manager for Religious Programs. If approved, the change will apply Department wide. *Chaplains will attempt to recruit volunteers representing the religious faith group.*

Dkt. 35, Exhibit A at 4 (emphasis added). According to defendants, DOC policy provides the means for religious programming but DOC is not responsible for providing requested programming in the event that no volunteers are available.

DOC Policy 560.200(III)(C)(1) states:

> When an offender's faith is not represented through the facility chaplaincy or volunteers, *the Chaplain/designee may assist the offender in contacting a religious leader with the appropriate credentials from the faith group.*
> 1. *Lack of volunteers from a particular faith group may restrict the ability to provide consistent programming or materials.* In the event no volunteers are available, offenders may request faith group materials through recognized organizations.

Dkt. 35, Exhibit A, at 5. According to defendants, pursuant to this policy, DOC Chaplains may (and do) assist offenders in contacting religious leaders but they are not required to perform that duty. Dkt. 35, at ¶ 6. According to plaintiff, the Chaplains are responsible for attempting to recruit volunteers under DOC Policy 560.200(III)(B)(2).

Defendants assert that DOC Chaplains also sometimes cover supervision duties for religious services when a sponsor is not available to supervise. Dkt. 35 at ¶ 22. However, defendants state it is simply not possible to provide supervision of every requested service that does not have a volunteer. *Id.*, at ¶ 6. For this reason, according to defendants, scheduled services are sometimes cancelled pursuant to DOC Policy 560.200(IV)(D)(3), which states, "[r]eligious programs and services may be cancelled and not rescheduled due to: a. Unavailability of the

1    sponsoring religious faith group or a designated employee/contract staff/volunteer supervisor . . .

2    ." *Id.*, at ¶ 9; Exhibit A at 9-10.

3    **B.    Jewish Shabbat Services at SCCC in 2016 and 2017**

4         According to plaintiff, Shabbat is a day of rest and spiritual enrichment for adherents of

5    Judaism. Dkt. 5, at 9. At the time plaintiff came to SCCC in June of 2016, Jewish inmates

6    attended supervised pre-Shabbat services on Friday afternoons at SCCC. *Id.*, at 17, ¶ 29.

7    Defendant Wakeman asserts that in August of 2016, the volunteer who was supervising the

8    Jewish services notified him that he would no longer be able to be at SCCC on Fridays when the

9    Jewish Shabbat services occurred. Dkt. 35, at ¶ 7. According to defendant Wakeman, when

10   plaintiff complained about the change, he told him to seek out and provide him with the name

11   and address for another volunteer to come in on Fridays. *Id.*, at ¶ 8.

12        Defendant Wakeman also indicates that he suggested a volunteer who might be available.

13   *Id.*, at ¶ 8. According to defendant Wakeman, none of the Jewish inmates -- including plaintiff --

14   provided him the DOC 21-142 Religious Requirement Information Sheet to contact a potential

15   new volunteer per policy to supervise the Friday services and without a volunteer to supervise

16   the services, they had to be canceled. *Id.*, at ¶ 8.

17        Thus, according to defendants, between August 19, 2016 and December 23, 2016, Friday

18   Jewish Shabbat Services were cancelled because there was no volunteer to supervise the Jewish

19   services. Dkt. 35, at ¶ 9. Defendant Wakeman indicates that -- although he was not required to do

20   so -- in an effort to help, he contacted the volunteer he had suggested to plaintiff to see if that

21   volunteer could supervise the Jewish services on Fridays. Dkt. 35, at ¶ 10. The volunteer agreed

22   and the Jewish Friday services resumed in January 2017. *Id.*, at ¶ 10. In 2017, Jewish Shabbat

23

24

25

1    services were scheduled every week from January 1, 2017, through the Friday prior to plaintiff's

2    departure from SCCC on November 28, 2017. Dkt. 35 at ¶ 13.

3         While these services were scheduled, they did not always occur -- because occasionally a

4    community volunteer was not available to supervise the services. *Id.*, at ¶ 13. When there was no

5    volunteer, plaintiff was able to study the Torah in his cell and adhere to a kosher diet (if he

6    requested one). *Id.* Supervised Jewish studies meetings also occurred during this time period,

7    which plaintiff attended. *Id.*, at ¶ 11.

8         Plaintiff's version of these events is somewhat different. He contends in June 2016 the

9    Orthodox Jewish Group did not have an approved Stafford Creek Religious sponsor/volunteer

10   but that defendant Wakeman oversaw the Jewish Group for Friday afternoon Shabbat services.

11   Dkt. 5, at 17. According to plaintiff, defendants terminated Jewish Shabbat Services from mid-

12   August through December 2016 citing DOC 560.200(iv)(D)(3) which provides  "[r]eligious

13   programs and services may be cancelled and not rescheduled due to: a. Unavailability of the

14   sponsoring religious faith group or a designated employee/contract staff/volunteer supervisor . . .

15   ." *Id*., at 17-18.

16        According to plaintiff, defendant Wakeman never provided him with DOC 21-142

17   Religious Requirement Information Sheet or informed him that he would need to contact and

18   provide the information for a new outside volunteer to supervise Shabbat services. Dkt. 5, at 17-

19   21. According to plaintiff, he spoke with DOC contract Jewish Chaplain Asaf Erez who

20   indicated he would speak with defendant Wakeman. *Id.*

21        Plaintiff indicates he spoke with defendant Wakeman on November 2, 2016, about

22   potentially having one of three Messianic volunteers either supervise Friday Jewish Services, or

23   having the Jewish Group share the room with the Messianic group with the divider pulled. *Id.*

24

25

REPORT AND RECOMMENDATION - 6

1    Plaintiff indicates defendant Wakeman told him he would talk to the Messianic volunteers. *Id.*

2    Plaintiff indicates he asked defendant Wakeman on November 23, 2016, if he had spoken with

3    the Messianic volunteers and was informed he had not. *Id.* Plaintiff asserts that he asked

4    defendant Wakeman if he would resume supervising Shabbat services but defendant Wakeman

5    refused on the grounds that if he did it for the Jewish group he would have to do it for every

6    group. *Id.*

7        Plaintiff indicates he disputed defendant Wakeman's position, because the Jewish Group

8    had particular difficulty obtaining an outside volunteer -- the Orthodox Jewish religion prohibits

9    working and driving on Shabbat. *Id.* Plaintiff also indicates he pointed out to defendant

10   Wakeman that the secular group known as Roots of Success is inmate-led and is permitted to

11   meet without direct in-room supervision; plaintiff asserts that he asked whether the same

12   accommodation could be made for the Jewish Group – defendant Wakeman refused. *Id.*

13       According to plaintiff, on December 16, 2016, plaintiff attended the Messianic service to

14   speak to the sponsors/volunteers about possibly supervising the Orthodox Jewish Shabbat

15   services. Dkt. 5, at 23. Plaintiff indicates he spoke to one of the Messianic volunteers, Bob

16   Gordon, about the Orthodox Jewish group potentially sharing religious call out and room with

17   the divider pulled with the Messianic group. *Id.*, at 24.

18       Plaintiff indicates Mr. Gordon did not believe this would be conducive to either group.

19   *Id.* However, Mr. Gordon informed plaintiff that defendant Wakeman had spoken to him that

20   same day about possibly having one of the Messianic volunteers temporarily provide oversight to

21   the Jewish Group's Friday Shabbat services, and that Messianic volunteer Ralph Brock would be

22   volunteering beginning on January 6, 2017. *Id.* Plaintiff indicates that no Shabbat services were

23

24

25

conducted on February 24, 2017, and June 23, 2017, due to the lack of a community sponsor. *Id.*, at 26.

On July 21, 2017, defendant Wakeman cancelled Shabbat services because plaintiff was the only adherent to show up. Dkt. 35, at ¶ 14. According to defendant Wakeman, he believed at that time that at least three inmates had to be present for services pursuant to policy. *Id.* Defendant Wakeman alleges that he had the understanding, according to policy, one offender could not be in an isolated area with one staff/volunteer. *Id.*, at ¶ 15. According to defendant Wakeman, he was later informed that P building, where the services occur, was not categorized as an isolated area and the issue was corrected. *Id.*, at ¶ 15. The July 21, 2017, incident affected one Friday service and defendant Wakeman states that this was not done because of ill will toward plaintiff or his religious beliefs but, rather, he was implementing policy as he understood it. *Id.*, at ¶ 15.

Plaintiff claims that after services were cancelled by defendant Wakeman on July 21, 2017, plaintiff inquired with Correctional Unit Supervisor Stephanie Baltzell, custody counselor James Forbis, and grievance coordinator L. Schnase about the policy requiring three inmates to be present in order for religious services to take place. Dkt. 5, at 31-35. Plaintiff indicates that C.U.S. Baltzell, counselor Forbis and coordinator Schnase responded that they were not aware of such a policy. *Id.*

Plaintiff implies defendant Wakeman pretended this policy existed -- in order to prevent him from engaging in Shabbat services. *Id.* Plaintiff indicates that on the three weeks prior to July 21, 2017, he had been the only adherent present for Shabbat services and had been allowed to have services alone with volunteer Ralph Brock present. *Id.*

On August 18, 2017, Messianic volunteer Ralph Brock informed plaintiff that August 25, 2017, would be his last Jewish Shabbat service as he needed to return to the Messianic group. Dkt. 5, at 37. Plaintiff indicates Mr. Brock informed him on August 25, 2017, at the close of Shabbat observance, that the Jewish Group would have a Stafford Creek Staff member supervise the Jewish Group beginning in September. *Id.*, at 38.

Plaintiff indicates no Jewish Shabbat took place due to the fact no volunteer was present on September 1, 2017. *Id.* On September 8 and 15, 2017, Messianic volunteer Ralph Brock allowed plaintiff to close the room divider between P Building's rooms with Messianic services performed up front and plaintiff's Orthodox Jewish Shabbat performed in back. *Id.*, at 39-45. On September 29, and October 20, 2017, neither Orthodox Jewish volunteer nor Messianic volunteer was present and defendant Wakeman supervised the Messianic inmates while plaintiff conducted pre-Shabbat services but defendant Wakeman refused to allow plaintiff to close the room divider. *Id.*

Plaintiff states that no Jewish Orthodox volunteer was present On October 13, 2017, and the Messianic Group was moved to the Jewish Group's usual room forcing him to conduct Jewish Shabbat services in the hallway. *Id.* Plaintiff indicates no Jewish Shabbat services took place on November 24, 2017, as there was no volunteer available. *Id.* On November 27, plaintiff was transferred from SCCC to MCC for religious observances purposes. *Id.*

## C.    Exceptions for Muslim Inmates at SCCC

Plaintiff alleges that Muslim inmates were permitted to have services without a volunteer or sponsor present while he was not permitted to meet to have services without a volunteer or sponsor. Dkt. 5, at 14-15, ¶ 18. The Jumu'ah is a congregation prayer that Muslims hold every Friday. Dkt. 36, Stewart Decl., at ¶ 12. The number of inmates who participate in Jumu'ah

1    services at SCCC is very large. *Id.* According to SCCC Associate Superintendent of Programs,

2    Jeneva Cotton, the contract chaplain for Muslim services requested and pre-arranged with DOC

3    headquarters to have staff periodically oversee Jumu'ah services during separate timeframes in

4    2016 and 2017 when he was not going to be available. Dkt. 33, Cotton Decl., at ¶5.1. According

5    to defendants, this was a temporary exception made to policy that only occurred for the specified

6    pre-arranged time frames. *Id.*, at ¶ 5.

7    According to defendants, unlike plaintiff's group, the Muslim inmates always had a

8    contract Chaplain for their services at SCCC; but he was not able to be present for these short

9    periods of time. Dkt. 33, at ¶ 5; Dkt. 36, at, ¶¶ 13-14. In addition, according to defendants, the

10    Muslim services are well attended by adherents so it was necessary for them to have a separate

11    room for services. Dkt. 33, at ¶ 5. Defendants indicate that because plaintiff was almost always

12    the only adherent to attend the Jewish Services, it was not necessary for him to have a separate

13    room for his services. *Id.*, at ¶ 5.

14    Defendant Cotton emphasizes that the arrangements for the Muslim worshipers were

15    temporary and pre-arranged whereas any exception to policy made for plaintiff would be more or

16    less a permanent exception to policy for just one inmate. Dkt. 33, at ¶ 5; Dkt. 36, at ¶ 14.

17    Defendant Stewart explains that she approved these temporary exceptions to DOC policy but she

18    maintained serious concerns over security. Dkt. 36, at ¶ 12. Defendant Stewart states that the

19    temporary nature of these exceptions made it possible to rearrange staff duties temporarily and

20    have custody staff monitor Jumu'ah services until the Muslim Chaplain returned. *Id.*, at ¶ 12.

21    Defendant Stewart also states that the Department does not have the resources to employ

22    a contract chaplain for just one inmate's services. *Id.*, ¶ 15. Further, defendant Stewart indicates

23    that even if DOC had the resources to do so, it is unlikely that a contract Chaplain could have

24

25

been found for plaintiff as it has always been difficult to find Jewish volunteers willing to travel to SCCC due to its remote location. *Id.*, at ¶ 15. Defendant Stewart states that DOC only employs contract chaplains when possible for the largest faith groups at each facility. *Id.*, at ¶ 15. She states that SCCC has a large population of Muslim adherents and that is why they have a contract chaplain. *Id.*

According to plaintiff, Jumu'ah services were held without an outside sponsor present on several dates with either defendant Wakeman or SCCC staff performing spot checks. Dkt. 5. Specifically, plaintiff indicates this was the case on December 9, 2016, December 16, 2016, June 23, 2017, July 14, 2017, July 21, 2017, and July 28, 2017. *Id.*, at 19-45. Plaintiff also asserts that Ramadan services were held on June 2, 2017, and June 27, 2017, without an outside sponsor present and with either defendant Wakeman or SCCC staff performing spot checks. *Id.* Plaintiff contends this shows that DOC Policy requiring an outside sponsor was applied in a discriminatory fashion, i.e. more strictly against his Orthodox Jewish Group than against the Muslim group for which exceptions to the policy were made. *Id.*

**D.    Friday Jewish Services at MCC-TRU**

In 2017, defendant Stewart reached out to Jewish community leaders to learn what they believed would help the DOC better serve their members. Dkt. 36, at ¶ 21. One of their suggestions was that DOC should try to move most Jewish inmates to the Monroe Correctional Complex (MCC), where it would be easier for Jewish volunteers to supervise services. *Id.*, at ¶ 21.

Based on this input, defendant Stewart helped to facilitate moving most Jewish inmates to MCC so that more consistent service to that population could be maintained. *Id.*, at ¶ 21. Plaintiff was transferred to MCC as a part of that effort on December 4, 2017. *Id.*, ¶ 24; Dkt. 34, Fischer

1    Decl., at ¶¶ 4-6. Defendants present evidence through the declaration of Henri Fischer, the

2    Chaplain at MCC, that plaintiff has been able to participate in weekly Friday Jewish services at

3    MCC-Twin Rivers Unit (TRU) since he arrived. *Id.*, at ¶ 5.

4        Chaplain Fischer indicates he believes plaintiff has generally been happy with the

5    arrangement. *Id.*, at ¶ 5. Chaplain Fischer states he cannot recall a Friday Jewish service that has

6    been cancelled due to the lack of a community sponsor during plaintiff's tenure at MCC and that

7    the Friday Jewish services are well attended. *Id.*, at ¶6. Chaplain Fischer states he and other staff

8    have had constructive conversations with plaintiff about his religious needs as a practicing

9    (though not ethnic) Jew. *Id.*, at ¶ 7. Chaplain Fisher further states there has consistently been a

10   community sponsor for the Jewish services at MCC-TRU since December of 2017. *Id.*, ¶ 8.

11       Chaplain Fischer states that to the best of his recollection, if the community sponsor was

12   not available for a particular service, Chaplain Fischer or another volunteer have been able to

13   cover the Friday Jewish Services at MCC-TRU. Dkt. 34, at ¶8. He states that when plaintiff

14   arrived, Friday services were conducted using a Reformed Jewish liturgy, which had been in use

15   for years. *Id.*, ¶ 9. After another Orthodox Jew complained -- with plaintiff's participation, a

16   compromise was reached, alternating Reformed and Orthodox services every other week. *Id.*, at

17   ¶ 9. According to Chaplain Fischer, this seems to have satisfied everyone involved. *Id.*, at ¶ 9.

18        Chaplain Fisher states that plaintiff participated in the MCC Annual Jewish Event on

19   May 14 – close to Jewish feast of Shavuot, which commemorates the giving of the Law at Mt.

20   Sinai under Moses; plaintiff has been able to participate in all of the Jewish fasts of 2018; and he

21   has participated in Yom Kippur, Sukkot and Hanukah special services as well. *Id.*, at ¶¶ 10, 11,

22   12. Defendants also present evidence that because there is now a larger group of Jewish

23

24

25

1  adherents at MCC, DOC has just recently hired a contract Jewish chaplain to serve the Jewish

2  population at MCC. Dkt. 36, at ¶ 21.

3      In his response to defendants' motion, plaintiff indicates generally that Shabbat services

4  at MCC were cancelled sometime in March 2019, and that Chanukah and Purim services had

5  also been cancelled on a few occasions at MCC. Dkt. 47, at 18; Dkt. 47-2, at 113-131.

6                                    DISCUSSION

7  **A.      Legal Standard**

8      Summary judgment is supported "if the pleadings, the discovery and disclosure materials

9  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

10  movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP)

11  56(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute

12  of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

13     A genuine dispute concerning a material fact is presented when there is sufficient

14  evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty*

15  *Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element

16  of a claim or defense and whose existence might affect the outcome of the suit," and the

17  materiality of which is "determined by the substantive law governing the claim." *T.W. Elec.*

18  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

19     When the Court considers a motion for summary judgment, "[t]he evidence of the non-

20  movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.,* at

21  255. Yet the Court is not allowed to weigh evidence or decide credibility. *Anderson v. Liberty*

22  *Lobby, Inc.,* at 255. If the moving party meets their initial burden, an adverse party may not rest

23  upon the mere allegations or denials of his pleading; his or her response, by affidavits or as

24  otherwise provided in FRCP 56, must set forth specific facts showing there is a genuine issue for

25

1    trial. FRCP 56(e)(2). The Court may not disregard evidence solely based on its self-serving

2    nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

3         If a summary judgment motion is filed early in the litigation – before there has been a

4    realistic discovery opportunity relating to each party's theory of the case -- the District Court

5    should grant any FRCP 56(d) motion "fairly freely". *Jacobson v. United States Department of*

6    *Homeland Security,* 882 F.3d 878, 883-84 (9th Cir. 2018).

7         In response to the motion for summary judgment, the nonmoving party is required to

8    present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.,* 7 F.3d 137, 138

9    (9th Cir. 1993). The court must determine whether the specific facts that are presented by the

10   non-moving party, considered along with undisputed context and background facts, would show

11   that a rational or reasonable jury might return a verdict in the non-moving party's favor based on

12   that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

13        To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct

14   complained of was committed by a person acting under color of state law, and (b) the conduct

15   deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the

16   United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*,

17   *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an

18   alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d

19   1350, 1354 (9th Cir. 1985).

20        Under Section 1983, an inmate must show that each of the defendants was involved in

21   violating the Constitution; liability of an official will only be found if there is individual culpable

22   action or inaction. *Hines v. Youseff,* 914 F.3d 1218, 1228 (9th Cir. 2019).

23

24

25

REPORT AND RECOMMENDATION - 14

1    Unless plaintiff makes a two-part showing, qualified immunity shields government

2    officials from liability. The plaintiff must show both: the official(s) violated a federal statutory or

3    constitutional right, and -- at the time of the alleged act or failure to act there was clearly

4    established law that defined the contours of the federal right objectively putting the official(s) on

5    notice – i.e., every reasonable official would understand that what they are doing is unlawful.

6    *Escondido v. Emmons,* 139 S.Ct. 500, 503 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577,

7    589 (2018).

8    When qualified immunity is reviewed in the context of a defense motion for summary

9    judgment, the evidence must be considered in the light most favorable to the plaintiff with

10   respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam). If there is a

11   genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable

12   officer that their conduct was unlawful under the circumstances they confronted, and (2)

13   Whether the defendant's conduct violated a constitutional right" then summary judgment

14   granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston,* 883 F.3d 865, 871-

15   72 (9th Cir. 2018).

16   To determine whether there was clearly established law, the Court has stated, "[w]hile

17   there does not have to be a case directly on point, existing precedent must place the lawfulness of

18   the particular [action] beyond debate"; and the Court has also observed, "there can be the rare

19   obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though

20   existing precedent does not address similar circumstances." *Wesby,* at 590. A clearly established

21   right exists if "controlling authority or a robust consensus of cases of persuasive authority" have

22   held, on facts that are close or analogous to the current case, that such a right exists. *Hines v.*

23   *Youseff*, at 1228. In some contexts, there may be a general constitutional rule that has been

24

25

1    identified in court decisions – and it may apply with such obvious clarity to the specific conduct

2    of a defendant, that qualified immunity will not apply even though existing case law did not

3    describe the specific factual scenario in the current situation. *United States v. Lanier,* 520 U.S.

4    259, 271 (1997); *Bonivert v. City of Clarkston,* 883 F.3d 865, 872-73 (9th Cir. 2018). If qualified

5    immunity operated as a shield for all conduct that was not specifically addressed in existing case

6    law at the time of the event in question, then officials would not ever be held accountable for

7    unprecedented constitutional violations that would appear obvious. *Hope v. Pelzer*, 536 U.S. 730,

8    740-42 (2002) (finding that a correctional officer's act of handcuffing an inmate to a hitching

9    post in a painful position under dangerous and degrading circumstances was "antithetical to

10    human dignity" and so obviously wanton, painful and cruel under the Eighth Amendment that

11    the officer had fair notice that this was unlawful under existing legal precedent).

12    **B.    RLUIPA**

13        In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act

14    (RLUIPA), which provided heightened protection of religious beliefs to prevent undue barriers

15    to religious observances by persons institutionalized in state or federal institutions. Under

16    RLUIPA, no government "shall impose a substantial burden on the religious exercise of a person

17    residing or confined to [a jail, prison or other correctional facility] ... even if the burden results

18    from a rule of general applicability," unless the burden furthers a "compelling governmental

19    interest" and is the "least restrictive means of furthering that compelling governmental interest."

20    42 U.S.C. § 2000cc–1(a).

21        However, RLUIPA does not allow claims for damages against individuals sued in their

22    official or individual capacities. *See Wood v. Yordy*, 753 F.3d 899, 901 (9th Cir. 2014) (a

23    RLUIPA claim for damages against prison officials in their individual capacities "may not be

24

25

maintained"); *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1114 (9th Cir. 2010) ("The Eleventh

Amendment bars [the plaintiff's] suit for official-capacity damages under RLUIPA.").

Accordingly, the only relief plaintiff may receive under RLUIPA is prospective injunctive relief.

A case is moot "when it has 'lost its character as a present, live controversy of the kind

that must exist if [the court is] to avoid advisory opinions on abstract propositions of law.' "

*Oregon v. FERC,* 636 F.3d 1203, 1206 (9th Cir. 2011) (per curiam) (quoting *Hall v. Beals,* 396

U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam)). Because "[t]he jurisdiction of

federal courts depends on the existence of a 'case or controversy' under Article III of the

Constitution," we must dismiss a case that has become moot. *Pub. Util. Comm'n of Cal. v.*

*FERC,* 100 F.3d 1451, 1458 (9th Cir. 1996) (quoting *GTE Cal., Inc. v. FCC,* 39 F.3d 940, 945

(9th Cir. 1994)).

"[W]hen a prisoner is moved from a prison, his action will usually become moot as to

conditions at that particular facility." *Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001); *Dilley*

*v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) ("An inmate's release from prison while his claims

are pending generally will moot any claims for injunctive relief relating to the prison's policies

unless the suit has been certified as a class action."). An exception to the mootness doctrine

exists if a plaintiff shows there is a "reasonable expectation" or "demonstrated probability" he

will return to the prison from which he was transferred. *See Darring v. Kincheloe*, 783 F.2d 874,

876 (9th Cir. 1986).

Here, plaintiff's complaint alleges the application at SCCC of DOC Policy 560.200

requiring that inmate groups have a community sponsor to supervise services violated his rights

under RLUIPA.[1] However, plaintiff no longer has standing to request prospective injunctive

---

[1] Plaintiff clearly raises an "as applied" challenge to the application of DOC Policy 560.200 at SCC. To the extent plaintiff intends to also allege a facial challenge to DOC Policy 560.200, he fails to show "that no set of

relief at SCCC -- he has been transferred to MCC. Thus, plaintiff's RLUIPA claim and other

claims for injunctive relief are moot because he is no longer incarcerated at SCC. *See*

*Barendt v. Gibbons*, 671 Fed.Appx. 515 (9th Cir. 2016) (mem) (finding plaintiff's RLUIPA

claim moot where plaintiff no longer incarcerated at the facility). Moreover, plaintiff fails to

show there is a "reasonable expectation" or "demonstrated probability" he will return to SCC

such that an exception to the mootness doctrine applies.

      Defendants also present evidence that MCC has consistently had a community sponsor

for the Jewish services since plaintiff's arrival in December 2017. Dkt. 34, at 2. The Chaplain at

MCC states in his declaration that, he cannot recall a Friday Jewish service that has been

cancelled due to the lack of a community sponsor during plaintiff's tenure and that to his

recollection if the community sponsor was not available for a particular service, he or another

volunteer had been able to cover Friday Jewish services. *Id.* Furthermore, defendants present

evidence that because there is now a larger group of Jewish adherents at MCC, DOC has just

recently hired a contract Jewish chaplain to serve the Jewish population at MCC. Dkt. 36, at ¶

21.

---

circumstances exist under which [the policy] would be valid" or that it "lacks any 'plainly legitimate sweep." *See U.S. v. Stevens*, 559 U.S. 460, 473 (2010) (internal citations and quotation marks omitted). Plaintiff admits that, even while at SCCC, he was permitted to have Shabbat services when a sponsor or volunteer was available. The Court also notes that courts have rejected challenges under both RLUIPA and the First Amendment to similar policies requiring non-inmate volunteers for group worship. *See, e.g., Hathcock v. Cohen*, 287 Fed. Appx. 793, 800 (11th Cir. 2008) (applying *Turner* to decide volunteer policy reasonably related to security and budgetary concerns); *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (requiring outside volunteer did not substantially burden religious exercise); *Jihad v. Fabian*, Civ. No. 09–1604, 2011 U.S. Dist. LEXIS 46930, at *31, 2011 WL 1641885 (D. Minn. Feb. 17, 2011) (deciding volunteer policy not a burden because plaintiff had other ways to practice his religion); *but see Brown v. Alden,* No. CV–09–05089–CI, 2011 U.S. Dist. LEXIS 131347, ——20–26, 2011 WL 5520429 (E.D.Wash. Oct.13, 2011) (denying summary judgment for state prison officials because record did not show why outside volunteer was necessary); *Leishman v. Patterson*, No. 2:11-CV-00309 CW, 2014 WL 2117543, at *6 (D. Utah May 21, 2014) (requiring outside volunteer familiar with specific religion to monitor communal worship did not violate RLUIPA). Thus, plaintiff has not met his burden as required to succeed on a facial challenge to show that there are no circumstances under which DOC Policy 560.200 requiring an outside community volunteer for group worship would be valid.

1    In his response to defendants' motion, plaintiff alleges the application of DOC Policy

2   560.200 continues to be an issue at MCC indicating generally that Shabbat services were

3   cancelled sometime in March 2019. Dkt. 47, at 18. However, plaintiff fails to explain the

4   circumstances under which Shabbat services were cancelled on this occasion in March 2019. His

5   generalized, conclusory assertion is insufficient to rebut defendants' evidence that MCC has

6   consistently had a community sponsor for the Jewish services since plaintiff's arrival and that

7   when that community sponsor has been unavailable, Chaplain Fisher or another volunteer has

8   covered Friday Jewish services.

9    Plaintiff also asserts that Chanukah and Purim services have been cancelled on a few

10   occasions at MCC. Dkt. 47-2, at 113-131. However, plaintiff's complaint in this action is related

11   to Shabbat and the importance of Shabbat as the "central service of Judaism." Dkt. 5. Plaintiff

12   has not raised any similar claims with respect to Chanukah or Purim in his complaint, nor does

13   he present facts or additional evidence in his response that the canceling of these services has

14   substantially burdened the exercise of his religion. *See Warsoldier v. Woodford*, 418 F.3d 989,

15   994 (9th Cir. 2005) (citing *Cutter*, 125 S. Ct. at 2119) (Under RLUIPA, a plaintiff "bears the

16   initial burden of going forward with evidence to demonstrate a prima facie claim" that the

17   challenged state action constitutes "a substantial burden on the exercise of his religious

18   beliefs."); *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (internal quotes omitted) ("[A]

19   burden is substantial under RLUIPA when the state denies [an important benefit] because of

20   conduct mandated by religious belief, thereby putting substantial pressure on an adherent to

21   modify his behavior and to violate his beliefs."). The Court also notes that "relatively short-term

22   and sporadic" intrusions do not constitute a substantial burden on the free exercise of religion.

23   *See Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998). In sum, plaintiff has not sufficiently

24

25

1    alleged the community sponsor requirement as applied to him at MCC has imposed a substantial

2    burden on the free exercise of his religion.

3         Accordingly, the Court recommends that plaintiff's RLUIPA claims be denied as moot.

4    **C.    First Amendment**

5         In order to implicate the Free Exercise Clause, the inmate's belief must be religious in

6    nature and sincerely held. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal

7    quotations and citation omitted); *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008)

8    (adopting the "sincerity test" set forth in *Malik, supra*). Defendants do not assert that plaintiff

9    was not sincere in the exercise of his religious beliefs.

10        Inmates with such beliefs have "[t]he right to exercise [their] religious practices and

11   beliefs...." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citing *O'Lone v.

12   Estate of Shabazz*, 482 U.S. 342, 348 (1987). A free exercise violation occurs when the

13   defendants burden the practice of an inmate's religion by preventing the inmate from engaging in

14   sincere religious conduct. *See Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), *overruled

15   in part by Shakur,* 514 F.3d at 885.

16        A mere inconvenience does not give rise to a violation; the burden imposed must be

17   substantial. *Freeman*, 125 F.3d at 737; *Jones v. Williams*, 791 F.3d 1023, 1031-32 (9th Cir.

18   2015) ("A substantial burden ... place[s] more than an inconvenience on religious exercise; it

19   must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert

20   substantial pressure on an adherent to modify his behavior and to violate his beliefs.").

21        "The right to exercise religious practices and beliefs does not terminate at the prison

22   door[,]" *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Estate of

23   Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)), but a prisoner's right to

24

25

free exercise of religion "is necessarily limited by the fact of incarceration," *Ward v. Walsh,*
F.3d 873, 876 (9th Cir. 1993) (citing *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400). "To ensure that
courts afford appropriate deference to prison officials," the Supreme Court has directed that
alleged infringements of prisoners' free exercise rights be "judged under a 'reasonableness' test
less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional
rights." *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400.

A restriction on an inmate's First Amendment religious rights is valid if it is reasonably
related to legitimate penological interests. *See O'Lone*, 482 U.S. at 349 (*quoting Turner v. Safley*,
482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). The burden is on the prison officials to
prove that the restriction of the prisoner's exercise of religion was reasonably related to a
legitimate penological objective. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677–78 (9th
Cir.1997) (applying test from *O'Lone and Turner* to determine reasonableness of decision
denying Jewish prisoner's request for an all kosher diet). In making such a determination, the
district court should consider four factors:

> First, there must be a valid, rational connection between the prison regulation and the legitimate
> governmental interest put forward to justify it, and the governmental objective itself must be a
> legitimate and neutral one. A second consideration is whether alternative means of exercising the
> right on which the regulation impinges remains open to prison inmates. A third consideration is
> the impact accommodation of the asserted right will have on guards, other inmates, and the
> allocation of prison resources. Finally, the absence of ready alternatives is evidence of the
> reasonableness of a prison regulation.

*Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89–91).

Plaintiff contends the policy of requiring an outside volunteer to conduct group religious
services substantially burdened his ability to exercise his religion. Yet plaintiff fails to introduce
sufficient evidence to show that the restriction on group religious services when no volunteer
was available substantially burdened his ability to exercise his religion. Plaintiff emphasizes the
importance of Shabbat to the Orthodox Jewish religion and indicates generally that communal

1  worship is important. Yet plaintiff does not dispute defendants' evidence that, when pre-Shabbat

2  services were scheduled at SCCC, plaintiff was almost always the only adherent present for

3  those services.

4      Defendants also present evidence that when Shabbat services were cancelled due to the

5  lack of a volunteer/sponsor, plaintiff was still able to study the Torah and engage in pre-Shabbat

6  religious observance in his cell. Plaintiff alleges he informed defendants that the ability to study

7  the Torah and engage in pre-Shabbat religious observance in his cell was an inadequate

8  alternative because he did not have access to some of the items in the religious locker -- and that

9  he was prohibited from having some of those religious items in his cell. However, plaintiff

10  neither identifies the missing items, nor does he explain why his lack of access to those particular

11  items constituted a substantial burden.

12      The record shows that Shabbat religious services programming was cancelled entirely at

13  SCCC based on the lack of a volunteer/sponsor for a limited period of time (August 2016 –

14  December 2016). There is some dispute over whether it was defendant Wakeman's or plaintiff's

15  responsibility to look for an outside volunteer/sponsor for the Orthodox Jewish group; whether

16  defendant Wakeman did, or did not, provide plaintiff with the appropriate form for registering a

17  new volunteer/sponsor; and whether it was defendant Wakeman or plaintiff who initially

18  suggested Ralph Brock, the Messianic volunteer, as a potential volunteer/sponsor.

19      But, it is undisputed that plaintiff and defendant Wakeman each attempted to and

20  eventually succeeded in locating and recruiting Messianic volunteer Ralph Brock in November

21  2016 to supervise pre-Shabbat services beginning in January 2017. The record further shows that

22  regular Jewish pre-Shabbat programming then resumed until plaintiff was transferred to MCC,

23

24

25

1    although individual services were cancelled on occasion when the volunteer/sponsor could not be

2    present.

3    　　　　In sum, the record shows that: Plaintiff was almost always the only religious adherent to

4    appear when pre-Shabbat services were scheduled; regular pre-Shabbat programming was

5    cancelled entirely for about four months due to the lack of an outside volunteer/sponsor; both

6    plaintiff and the facility Chaplain made efforts to and ultimately did find a new volunteer;

7    plaintiff was able to study the Torah and engage in pre-Shabbat religious observance in his cell

8    during the four month period when programming was cancelled; plaintiff fails to identify what

9    additional religious items he required to properly observe in his cell or explain how the lack of

10   these items constituted a substantial burden. The Court should hold, under these circumstances,

11   that plaintiff fails to demonstrate that there are any genuine disputes of material fact concerning

12   whether the requirement of an outside volunteer for group religious services substantially

13   burdened the exercise of his religion.

14   　　　　Moreover, even if plaintiff could show a genuine dispute of material fact that would

15   support an arguable issue about whether there was a substantial burden on plaintiff's religious

16   exercise, the record supports defendants' contention that defendants' policy requiring an outside

17   volunteer for religious group services was reasonably related to the prison's legitimate security

18   and budgetary concerns. With respect to the first *Turner* factor, defendants present evidence

19   from DOC Program Administrator Belinda Stewart that "religious groups are of special concern

20   to prison administrators and DOC because inmates who set themselves up as religious leaders

21   would potentially wield more power over the members of their congregations [and] [t]his power

22   could be used to motivate followers to engage in threatening behavior such as riots and violence

23   toward other groups of inmates." Dkt. 36, at 2.

24

25

REPORT AND RECOMMENDATION - 23

1    The Ninth Circuit has previously found this to be a valid rationale for a regulation

2    requiring an outside individual, rather than an inmate, to lead religious activities in the prison

3    setting. *See Anderson v. Angelone*, (123 F.3d 1197 (9th Cir. 1997) ("Upholding Nevada

4    prohibition on inmate-led religious services against a First Amendment challenge and finding

5    that "[r]equiring an outside minister to lead religious activity among inmates undoubtedly

6    contributes to prison security …[in that] [i]t helps ensure that inmate activity is supervised by

7    responsible individuals and lessens the possibility that inmate religious groups will subvert

8    prison authority.").

9    The record also shows that plaintiff was almost always the only inmate to attend Shabbat

10   services at SCCC and, while the DOC employs contract Chaplains for the largest inmate groups,

11   "the Department does not have the resources to employ a contract Chaplain for just one inmate's

12   services." Dkt. 36, at 2-4. Thus, the expense of providing services and supervision for plaintiff

13   alone was also a legitimate consideration. *See Overton v. Bazzetta*, 539 U.S. 126, 135, 123 S.Ct.

14   2162, 2169, 156 L.Ed.2d 162 (2003) (courts are "particularly deferential" to prison

15   administrator's regulatory judgments regarding security and allocation of financial resources).

16   Plaintiff fails to provide evidence of any genuine dispute of material facts that would

17   undermine the facts presented by the defense regarding the safety concerns and budgetary

18   constraints. Plaintiff argues that the secular group Roots of Success is inmate-led and is not

19   required to have an outside sponsor. However, defendants present evidence that their particular

20   security concern regarding religious groups justifies this distinction.

21   Plaintiff also argues that Muslim inmates were permitted to participate in group religious

22   services without an outside sponsor present while he was not. Plaintiff submits several

23   declarations from a Muslim inmate at SCCC, Roosevelt Reed, who confirmed that on some dates

24

25

1    in 2016 and 2017 the contract Muslim Chaplain was not present and either Chaplain Wakeman

2    or SCCC staff supervised. Defendants present evidence that the Muslim group's circumstance is

3    distinguishable from that of the plaintiff. First, defendants present evidence that the Muslim

4    group at SCCC was quite large and, as such, was assigned a contract Chaplain throughout the

5    subject period while plaintiff's Orthodox Jewish group often consisted of only the plaintiff and

6    for certain periods did not have a designated outside sponsor or volunteer. Second, defendants

7    present evidence that the contract Chaplain for Muslim services requested and pre-arranged with

8    DOC headquarters to have staff periodically oversee Muslim services during separate timeframes

9    in 2016 and 2017 when he was not going to be available.

10        The Court notes that in one of his declarations, Mr. Reed indicates that Chaplain

11    Wakeman supervised the Muslim group on December 16, 2019, because they "no longer had an

12    outside sponsor." However, Mr. Reed provides no facts to support this conclusory assertion.

13        Even assuming Mr. Reed's declaration is enough to raise a question as to whether there

14    was some brief period where the Muslim group lacked an official outside sponsor or contract

15    Chaplain, this does not substantially undermine the defendants' allegations of fact. The plaintiff

16    himself acknowledges that Chaplain Wakeman supervised the Jewish Orthodox service on a few

17    occasions when he first arrived when the Jewish Orthodox Group did not have a designated

18    outside sponsor and again after Ralph Brock ceased supervising the Jewish Orthodox Group in

19    August 2017.

20        However, the record supports defendants' allegation that when it became clear the lack of

21    a Jewish Orthodox volunteer/sponsor could be a longer term or permanent rather than temporary

22    accommodation, pre-Shabbat services were cancelled due to the lack of an outside sponsor. In

23    fact, Mr. Reed's declaration dated July 12, 2017, summarizing a conversation with defendant

24

25

1    Wakeman, supports defendants' distinction between the temporary and permanent exceptions to

2    the outside sponsor requirement -- and indicates this distinction was also made with respect to

3    the Muslim group. Dkt. 47-1, at 86. Specifically, Mr. Reed indicates that while defendant

4    Wakeman had agreed to supervise the Muslim group when prior arrangements had been made

5    and the Muslim Chaplain was unavailable, he refused to agree to permanently supervise the

6    Muslim group on one Friday of every month when the Muslim Chaplain would be regularly

7    unavailable stating that if he did that for one group he would have to do it for everyone. *Id.*

8        In sum, the Court finds that the first *Turner* factor weighs in defendants' favor as the

9    record shows a "valid, rational connection" between the prison regulation and the legitimate

10   governmental interest put forward to justify it." *Turner*, 482 U.S. at 89–91.

11       With respect to the second *Turner* factor, the record shows that plaintiff was almost

12   always the only adherent present when pre-Shabbat services were scheduled and that he was still

13   able to study the Torah and engage in pre-Shabbat religious observance in his cell during the

14   periods when an outside volunteer was unavailable and pre-Shabbat services were cancelled. As

15   discussed above, to the extent plaintiff argues the ability to study the Torah and engage in pre-

16   Shabbat observance in his cell was an inadequate alternative when no outside volunteer was

17   available because he did not have access to some of the items in the religious locker, he fails to

18   identify what those particular items were or why his lack of access to those items constituted a

19   substantial burden. Accordingly, absent additional evidence from plaintiff, the second factor

20   weighs in the defendants favor.

21       As to the third *Turner* factor, as discussed above, the record shows that allowing

22   offenders to conduct unsupervised religious meetings would lead to prison management issues

23   including potential security issues. Thus, this factor also weighs in the defendants' favor. Finally,

24

25

as to the fourth *Turner* factor, the record shows that allowing inmates to conduct unsupervised

religious services jeopardizes institutional safety and security. The record shows that prison staff

are not generally available to supervise religious groups, and because they are generally needed

elsewhere in the prison pulling them away from their assigned responsibilities on a regular basis

to supervise plaintiff raises safety and security issues.

In sum, based on the evidence in the record, the Court should hold that a reasonable jury

could only conclude that defendants have acted out of legitimate safety and budgetary concerns;

and as a matter of law there are compelling reasons to support the prison policy requiring non-

inmate volunteers for group worship.

The Court also notes that plaintiff contends that, on one occasion, defendant Wakeman

cancelled Jewish Shabbat services even though an outside volunteer was available because

plaintiff was the only adherent present for services. Defendant Wakeman acknowledges he

mistakenly believed at the time there was a policy requiring group services to be cancelled if

fewer than three adherents were present. He indicates that when it was clarified to him that this

policy did not apply in the building or location where plaintiff's group would meet, the error was

corrected and services resumed the next week.

Plaintiff draws the inference that defendant Wakeman made this policy up as a means of

intentionally discriminating against plaintiff and his religion. However, plaintiff presents no

evidence to support his speculation regarding defendant Wakeman's motives. Furthermore,

plaintiff fails to establish that defendant Wakeman's error in canceling Shabbat group services

on one occasion based on a misunderstanding of prison policy imposed a substantial burden on

the free exercise of his religion. *See, generally, Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir.

1   1998) (holding that "relatively short-term and sporadic" intrusions do not constitute a substantial

2   burden on the free exercise of religion).

3   **D.    Equal Protection**

4       Plaintiff's equal protection claim is premised on alleged disparate treatment with respect

5   to supervision requirements between his Orthodox Jewish group and the Muslim group as well as

6   two secular groups. Plaintiff contends exceptions were made to the requirement of an outside

7   sponsor under DOC policy for the Muslim group that were not made for his Orthodox Jewish

8   group in violation of the equal protection clause. He also contends the fact that secular groups

9   are not required to have an outside sponsor to meet as required by DOC policy for religious

10  groups also violates his right to equal protection.

11      The Equal Protection Clause requires that persons who are similarly situated be treated

12  alike. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87

13  L.Ed.2d 313 (1985). An equal protection claim may be established by showing that the defendant

14  intentionally discriminated against the plaintiff based on the plaintiff's membership in a

15  protected class, *Serrano v. Francis,* 345 F.3d 1071, 1082 (9th Cir. 2003), or that similarly

16  situated individuals were intentionally treated differently without a rational relationship to a

17  legitimate state purpose, *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073,

18  145 L.Ed.2d 1060 (2000); *Lazy Y Ranch Ltd. v. Behrens,* 546 F.3d 580, 592 (9th Cir. 2008). "In

19  the prison context, a prisoner must demonstrate that his treatment is invidiously dissimilar to that

20  received by other inmates." *Hurd v. Garcia*, 454 F.Supp.2d 1032 (S.D. Cal., Sept. 28, 2006).

21      Here, plaintiff has not shown that similarly situated inmates were intentionally treated

22  differently without a rational relationship to a legitimate state purpose. Plaintiff contends the

23  Muslim group was permitted to meet on several occasions for Jumu'ah (a congregation prayer

24

25

REPORT AND RECOMMENDATION - 28

1    that Muslims hold every Friday) as well as for Ramadan without an outside sponsor and with

2    either Chaplain Wakeman supervising or custody staff performing "spot checks."

3          Defendants acknowledge that the Muslim group was permitted to meet for short periods

4    of time during both 2016 and 2017 without an outside sponsor present. However, defendants

5    present evidence that this accommodation was made for the Muslim inmates for two reasons: (1)

6    the Muslim inmates always had a contract chaplain for their services but he was not able to be

7    present for pre-planned short periods of time; and, (2) there was a greater need for an exception

8    to the outside sponsor policy for Muslim inmates in that they were a very large group and thus

9    needed a separate space to meet as a group. Dkt. 36, at 2-4. In contrast, defendants point out that

10   there was no outside Jewish Orthodox sponsor for plaintiff during the period in question and that,

11   therefore, if they had made the same arrangement for plaintiff it would not have been a

12   temporary exception to the policy but a permanent exception. Defendants also offer evidence that

13   plaintiff was almost always the only adherent of the Jewish faith to attend Shabbat services on

14   Fridays in 2016 and 2017. *Id.*

15         Furthermore, as discussed above, defendants also present evidence that DOC policy

16   requires an outside sponsor for religious groups because "religious groups are of special concern

17   to prison administrators and DOC because inmates who set themselves up as religious leaders

18   would potentially wield more power over the members of their congregations [and] [t]his power

19   could be used to motivate followers to engage in threatening behavior such as riots and violence

20   toward other groups of inmates." *Id.*

21         Plaintiff has not shown that he is similarly situated to inmates belonging to the Muslim

22   group. Plaintiff does not dispute defendants' evidence that only a very small number of inmates

23   at SCCC identified as Jewish Orthodox during the relevant period and that plaintiff was almost

24

25

always the only person to show up for pre-Shabbat services. Prison officials are not required to provide exactly the same accommodations to large and small religious groups alike. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S. Ct. 1079, 1082, 31 L. Ed. 2d 263 (1972) ("We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."); *Blanks v. Cate*, No. 2:11-CV-0171 WBS CKD, 2013 WL 1129280, at *16 (E.D. Cal. Mar. 18, 2013) (dismissing plaintiff's equal protection claim in part because he failed to show he, as a member of a very small Rastafarian group at a prison, was similarly situated to inmates belonging to other significantly larger religious groups).

 Plaintiff has also not shown he is similarly situated to the secular groups who are permitted to be inmate-led and meet with less supervision than required for religious groups. Plaintiff does not present evidence to dispute defendants' showing that the basis for this policy distinction is that religious groups present a greater prison security concern than secular groups.

Accordingly, as plaintiff fails to show he was similarly situated to the Muslim group or the secular groups in question, his equal protection claim fails. The Court should grant defendants' motion for summary judgment on plaintiff's equal protection claim.

**E.    Qualified Immunity**

Defendants argue that even if the court finds plaintiff has submitted sufficient evidence to avoid summary judgment, his claims are barred by qualified immunity. As noted above, to defeat a defense of qualified immunity, a plaintiff must establish both elements: (1) that the defendants'

1    actions violated a specific statutory or constitutional right and (2) the right was clearly

2    established when the alleged violation occurred. Thus, even if a genuine issue of material fact

3    were established regarding whether the policy requiring non-inmate volunteers for group

4    worship violated plaintiff's rights, plaintiff is required to show the specific right -- that he be

5    provided a room (separate from his cell) to observe Shabbat or similar services without the

6    required presence of an outside community sponsor -- was clearly established.

7           Plaintiff cannot prevail on this second element. No clearly established law existed (at the

8    time of the events in question in this case) that the required presence of an outside community

9    sponsor to supervise religious group meetings violated a statutory or constitutional right. In fact,

10   several courts have found similar policies and practices to those at issue in this case did not

11   violate plaintiff's constitutional or statutory rights.

12          For instance, in *Anderson v. Angelone*, (123 F.3d 1197 (9th Cir. 1997)) the Ninth Circuit

13   upheld a Nevada prohibition on inmate-led religious services against a First Amendment

14   challenge finding that "[r]equiring an outside minister to lead religious activity among inmates

15   undoubtedly contributes to prison security …[in that] [i]t helps ensure that inmate activity is

16   supervised by responsible individuals and lessens the possibility that inmate religious groups will

17   subvert prison authority." *Anderson v. Angelone*, (123 F.3d 1197 (9th Cir. 1997); *see, also,*

18   *Sharp v. Johnson*, 669 F.3d 144, 159-60 (3d Cir. 2012); *Hathcock v. Cohen*, 287 Fed. Appx. 793,

19   800 (11th Cir. 2008) (applying *Turner* to decide volunteer policy reasonably related to security

20   and budgetary concerns); *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (requiring outside

21   volunteer did not substantially burden religious exercise); *Jihad v. Fabian,* Civ. No. 09–1604,

22   2011 WL 1641885 (D. Minn. Feb. 17, 2011) (deciding volunteer policy not a burden because

23   plaintiff had other ways to practice his religion); *Leishman v. Patterson*, No. 2:11-CV-00309

24

25

CW, 2014 WL 2117543, at *6 (D. Utah May 21, 2014) (requiring outside volunteer familiar with specific religion to monitor communal worship did not violate RLUIPA); *cf. Brown v. Alden,* No. CV–09–05089–CI, 2011 WL 5520429 (E.D. Wash. Oct.13, 2011) (denying summary judgment for state prison officials because record did not show why outside volunteer was necessary).

Likewise, even if an issue of fact existed with respect to plaintiff's equal protection claim, defendants are also entitled to qualified immunity with respect to that claim. No prior case law clearly establishes that prison officials are required to provide exactly the same accommodations to large and small religious groups alike. In fact, several courts have found the opposite. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S. Ct. 1079, 1082, 31 L. Ed. 2d 263 (1972) ("We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."); *Blanks v. Cate*, No. 2:11-CV-0171 WBS CKD, 2013 WL 1129280, at *16 (E.D. Cal. Mar. 18, 2013) (dismissing plaintiff's equal protection claim in part because he failed to show he, as a member of a very small Rastafarian group at a prison, was similarly situated to inmates belonging to other significantly larger religious groups).

Because the law prohibiting defendants' conduct was not clearly established, defendants are entitled to qualified immunity with respect to all of plaintiff's claims for damages.

## IN FORMA PAUPERIS STATUS ON APPEAL

The Court must also decide whether plaintiff's *in forma pauperis* status should continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court must determine whether

1    appeal is frivolous or malicious, or whether it fails to state a claim on which relief may be

2    granted.  *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

3         While the Court was not persuaded on the merits of plaintiff's claim, there is no evidence

4    that his appeal is frivolous or is taken in bad faith. Accordingly, the Court recommends that *in*

5    *forma pauperis* status should continue on appeal.

                                    <u>CONCLUSION</u>

6

7         Based on the foregoing discussion, the undersigned recommends the Court GRANT

8    defendants' motion for summary judgment and dismiss plaintiff's complaint with prejudice.

9         The parties have **fourteen (14) days** from service of this Report and Recommendation to

10   file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b). Failure to file

11   objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474

12   U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration

13   on **September 13, 2019**, as noted in the caption.

14        Dated this 23rd day of August, 2019.

15

16

17                              *Theresa L. Fricke*
                                _____
                                Theresa L. Fricke
18                              United States Magistrate Judge

19

20

21

22

23

24

25