UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

QUINTON P. BROWN,

        Plaintiff,

v.

GARY WAKEMAN,

        Defendant.

CASE NO. C18-5416 BHS

ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED

This matter comes before the Court on the Report and Recommendation ("R&R") of the Honorable Theresa L. Fricke, United States Magistrate Judge, Dkt. 55, Plaintiff Quinton P. Brown's ("Brown") objections to the R&R, Dkt. 56, and Defendants Jeneva Cotton, Margaret Gilbert ("Gilbert"), Belinda Stewart ("Stewart"), and Gary Wakeman's ("Wakeman") (collectively "Defendants") response to the objections, Dkt. 57.

On August 23, 2019, Judge Fricke issued the R&R recommending that the Court grant Defendants' motion for summary judgment and dismiss Brown's claims. Dkt. 55. On September 5, 2019, Brown filed objections. Dkt. 56. On September 16, 2019, Defendants replied. Dkt. 57. On December 13, 2019, the Court requested supplemental

briefing. Dkt. 58. On December 24, 2019, Defendants submitted a supplemental brief. Dkt. 59. On January 10, 2020, Brown replied. Dkt. 62.

Brown is an adherent of Orthodox Judaism. *See* Dkt. 5, ¶¶ 47–48. Brown was incarcerated at the Stafford Creek Corrections Center (SCCC) in Aberdeen, Washington between June 2016 and November 2017. *Id.* ¶ 2. Brown was transferred to the Monroe Correctional Complex ("MCC") in December 2017. *Id.*

Brown sues under 42 U.S.C. § 1983 and alleges violations of his First and Fourteenth Amendment rights and of the Religious Land Use and Institutionalized Persons Act (RLUIPA). *Id.*, ¶ 4. Brown's claims are based on Defendants' implementation of Department of Corrections ("DOC") Policy 560.200(VI)(D)(3)(a) ("DOC Policy 560.200"), *id.* ¶ 5, providing for cancellation without rescheduling of religious programs and services when a sponsoring religious faith group or designated employee/contract staff/volunteer supervisor is unavailable. Brown alleges that Defendants' conduct prevented him from engaging in pre-Shabbat and Shabbat services, possessing certain religious property, making use of foods for religious purposes, and having access to religious materials. *Id.*

The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3).

**1. RLUIPA**

Judge Fricke concluded that the only relief Brown may receive under the RLUIPA is prospective injunctive relief. Dkt. 55 at 17–18 (citing *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir. 1986)). Because Brown has been transferred to a facility where Jewish services are available and which has recently hired a contract Jewish chaplain, the R&R found he cannot show a reasonable expectation or demonstrated probability that he will experience the alleged harm again. *Id*.

Brown does not object to Judge Fricke's conclusions as to the likelihood of the challenged violations reoccurring. Brown's objections address Defendants' past conduct and alleged failure to neutrally apply policy under *Turner v. Safley*, 482 U.S. 78 (1987) ("*Turner*") as applicable to his First and Fourteenth Amendment claims.

**2. First Amendment**

Judge Fricke concluded that the Court should grant summary judgment for Defendants on Brown's First Amendment claim. Dkt. 55 at 27. Judge Fricke concluded that based on the evidence in the record "a reasonable jury could only conclude that defendants have acted out of legitimate safety and budgetary concerns" and as a matter of law "there are compelling reasons to support the prison policy requiring non-inmate volunteers for group worship." *Id.*

Brown's claims center on Defendants' policy requiring supervision of inmate religious services. This supervision can be provided by designated employees, contracted religious leaders, or outside volunteers. Dkt. 55 at 3 (citing Dkt. 35, Exhibit A at 9). Religious services may be cancelled under the policy if

the sponsoring faith group or designated employee, staff member, or volunteer supervisor is unavailable. *Id*.

Brown's objections focus on the way Judge Fricke analyzed Defendants' application of what the Court will refer to as the "supervision unavailable" policy (1) as to Brown across two periods of time and (2) as to Brown as compared to other prison groups. During the first time period, August 2016 through December 2016, Brown alleges he had no access at all to Jewish services because Defendants determined there was no available supervision. *See* Dkt. 56 at 6; Dkt. 62 at 8. During the second time period, July 2017 through November 2017, Brown alleges that though he lacked an outside religious volunteer he was still permitted to observe Shabbat in the religious services building, supervised by staff spot checks or by SCCC Chaplain Wakeman. *Id*.

Regarding the first time period, Defendants agree that Jewish Shabbat services were unavailable between August 19, 2016 and December 23, 2016, though the parties disagree about who supervised the services prior to August 19, 2016. *See* Dkt. 55 at 5–6. Regarding the second time period, as Judge Fricke describes, a comparison of Cotton's declaration and Brown's complaint shows that Shabbat services were generally available despite occasional cancellations during this period as either the sponsor for the Messianic Jewish group, Ralph Brock ("Brock") or Wakeman had agreed to supervise. *See* Dkt. 33, ¶ 7; Dkt. 5, ¶¶ 85, 115, 117; Dkt. 55 at 8–9. On one instance during this period, October 13, 2017, the Messianic group occupied the Jewish group's space and Brown had to conduct

his Shabbat observance in the hall. Dkt. 5, ¶ 116. The Court will address Brown's arguments regarding his treatment as compared to other groups in its analysis of his specific objections to Judge Fricke's conclusions on the individual *Turner* factors.

        a.      **First *Turner* Factor**

Under the first *Turner* factor, whether there was a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, Brown objects to Judge Fricke's conclusion that Defendants' asserted interest in security and conservation of resources was legitimate and neutral. Dkt. 56 at 2.

Brown's objections pertain to how the "supervision unavailable" policy was applied to two comparator groups at SCCC: (1) secular groups and (2) the Muslim faith group. First, regarding secular groups, Brown argues that because the policy requirement for an outside volunteer to supervise religious services based on security concerns was not legitimate and neutral because it did not apply to secular inmate meetings. However, as Judge Fricke explained, the Ninth Circuit has found that requiring an outside minister to lead religious activity among inmates does not violate free exercise rights under the First Amendment and advances the legitimate interest in prison security. Dkt. 55 at 24 (citing *Anderson v. Angelone*, 123 F.3d 1197, 1198 (9th Cir. 1997) ("*Anderson*")). Stewart, the Corrections Program Administrator for the DOC, declared that "[r]eligious groups are of special concern to prison administrators and DOC because inmates who set themselves up as religious leaders would potentially wield more power over the members of their congregations" which could be "used to motivate followers to engage in

threatening behavior . . . ." Dkt. 36, ¶¶ 8–10. Cotton, the Associate Superintendent of Programs at SCCC, declared that Roots of Success and Yoga Behind Bars are the only two secular programs approved at SCCC to be offender-led with staff spot-checks. Dkt. 33, ¶ 8. Cotton echoed Stewart's assertion, declaring that non-religious programs present different security concerns because inmates acting as religious leaders "can have significant influence over other inmates in their religious group" which can be used to motivate followers to engage in harm toward staff and other inmates. *Id.*

In *Thornburgh v. Abbott*, the Supreme Court explained that "the Court's reference to "neutrality" in *Turner* was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 490 U.S. 401, 415 (1989) (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). The Supreme Court further explained that where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Id.* at 415–16.

Relatedly, while *Anderson* did not address a comparator secular group, it similarly dealt with a restriction applied specifically to groups identified as religious, i.e. identified by content. Brown cites *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993) for the proposition that restriction of only religious and not secular conduct fails the neutrality requirement. Dkt. 56 at 9. However, *Church of the Lukumi* was decided outside of the prison context and under strict scrutiny. *Church of the*

*Lukumi*, 508 U.S. at 546–47. Under the lower standard in *Turner*, and with Brown's failure to put forward evidence in support of his argument that secular groups pose a similar security concern to religious groups (to counter Stewart's declaration), the Court agrees with the R&R's conclusion that the first *Turner* factor weighs in favor of Defendants as to the secular group comparison. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it"); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (the test for prison regulations alleged to infringe constitutional rights is a "'reasonableness' test less restrictive than ordinarily applied to infringements of fundamental constitutional rights.").

Second, Brown objects to Judge Fricke's conclusion that Defendants' implementation of the "supervision unavailable" policy was rationally related to legitimate budgetary and security concerns when considering his treatment as compared to the Muslim faith group, as well as when considering Defendants' alleged willingness in 2017 to accommodate his services despite the lack of an Orthodox Jewish volunteer. Dkt. 56 at 3–4.

The Court finds that the record supports Judge Fricke's conclusion that because supervising an inmate's religious practice outside his housing unit represents an expense for DOC, it is rational for DOC to allocate its resources by hiring contract Chaplains for larger faith groups and relying on outside sponsors to supervise smaller faith groups. Dkt. 55 at 23–25. The record additionally supports Judge Fricke's conclusion that it is rational for DOC to allocate its budgetary resources by agreeing to provide staff supervision for

religious services (either by Wakeman or through staff spot checks) on a temporary but not permanent basis. *Id.*

Regarding Wakeman's supervision, the record supports Judge Fricke's conclusion that even if Wakeman did in fact provide supervision to the Muslim group on some instances when the group was temporarily without a contract chaplain, he also provided supervision for Jewish services on a few occasions in the late summer or fall of 2016 when there was no Jewish volunteer, and on some occasions in the fall of 2017 when Brock's supervision had ceased. *Id*. at 25–26. Therefore, the record supports Judge Fricke's conclusion that Wakeman's supervision was neutrally allocated among faith groups.

Regarding providing supervision through staff spot-checks, Brown argues that because Defendants accommodated his lack of an outside volunteer through staff spot-checks in the fall of 2017, they could have accommodated his lack of an outside volunteer in the same way in 2016—in other words, the same resource and security needs were present during both periods, making the application of the policy in 2016 illegitimate. However, the Court finds as noted above that during the fall of 2017, Brown's services were primarily supervised by either Wakeman or Brock and were not primarily supervised through spot-checks. As compared to the Muslim faith group, the record supports Judge Fricke's conclusion that Defendants' temporary supervision practice were deployed in response to prearranged, defined absences by the Muslim chaplain and were not offered to any faith group on a permanent or indefinite basis, consistent with DOC's stated interest in its allocation of supervisory and financial

resources. Dkt. 55 at 25–26. In sum, the Court agrees that Judge Fricke's conclusion that Defendants' application of the "supervision unavailable" policy was legitimately related to its stated interests and neutrally applied.

b.     **Second *Turner* Factor**

Regarding the second *Turner* factor, an alternative means of exercising the right, Brown argues that the "supervision unavailable" policy functioned as an absolute prohibition on his right to congregate with other practitioners of his faith, use grape juice and matzah for blessing (which were stored in the religious services building), or use candles and matches for blessing (which he could not have in his cell). Dkt. 56 at 5. While Brown emphasizes the importance of communal services to his faith, Judge Fricke did not err in finding Brown was almost always the only adherent present for scheduled services, Dkt. 55 at 26, meaning his ability to engage in the communal aspect of his worship was in practice the same in his cell and in the religious services building.

However, the items Brown required to perform religious rituals present a different question. Since Brown's access to the religious services building where these items were stored was limited by the supervision requirement, practice in his cell was not similar in this regard. Brown's point regarding the lack of candles and matches, as well as his point about the use of grape juice and matzah, was not clearly part of the record before Judge Fricke. Dkt. 55 at 26 (noting that while Brown objected to lack of access to items in the religious locker, he did not identify the items or their purpose). Brown explains in his objections that grape juice, matzah, candles, and matches are necessary "to sanctify the Sabbath as commanded by Torah." Dkt. 56 at 5. In supplemental briefing, Defendants

argue, citing the declaration of Captain Eric W. Mainio, that inmates are not permitted to have candles and matches in their cells due to safety risks, and similarly are not permitted to use these items in communal spaces unsupervised. Dkt. 59 at 2 (citing Dkt. 61, ¶¶ 6, 17). Defendants also argue, citing Wakeman's second declaration, that if Brown had located an outside donor to provide him matzah and grape juice, "Chaplain Wakeman would have made every effort to facilitate Brown having access to the matzah and grape juice through the Chaplain's office." *Id.* at 3 (citing Dkt. 60, ¶ 5). Defendants argue that the fact that Brown did not seek an outside sponsor to provide matzah and grape juice shows these items' absence did not substantially burden his religious practice. *Id.* at 5.

In response, Brown argues that grape juice and matzah were already available in the Jewish locker and cites DOC policy providing that donated religious items may not be donated to specific offenders. Dkt. 62 at 3, 4 (citing Dkt. 35-1 at 12). Brown maintains that failing to observe Shabbat is not optional and is "an explicit life or death commandment." Dkt. 62 at 5; *see also* Dkt. 56 at 5. Brown maintains that it is his sincere religious belief that he will be punished with a heavenly sentence of death before the age of 60 years old and the spiritual extinction of his soul if he fails to observe Shabbat. *Id.*[1]

---

[1] Brown includes an affidavit swearing that his supplemental brief is true and correct under the penalty of perjury. Dkt. 62 at 10. Therefore, the Court treats the included facts which are within Brown's personal knowledge as if they were set forth in a declaration. *See McElyea v. Babbit*, 833 F.2d 196, 197–98 (9th Cir. 1987) (holding that a verified complaint based on personal knowledge setting forth specific, admissible facts may be considered in opposition to summary judgment).

In *Ward v. Walsh*, 1 F.3d 873, 877–78 (9th Cir. 1993) ("*Ward*") the Ninth Circuit compared the Muslim prisoners in *O'Lone*, 482 U.S. at 351–52, who were not able to attend the weekly Jumu'ah service but had the "virtually unlimited right to congregate for prayer and discussion outside of working hours," as well as free access to a state-provided imam, religious meals, and accommodation for mealtimes during Ramadan, with an Orthodox Jewish prisoner who had no access to a rabbi and was the only Orthodox Jew in the institution and thus could not congregate with others for prayer or discussion. The Ninth Circuit explained that "we cannot conclude that the opportunity to engage in private prayer is enough to satisfy the second *Turner* factor as interpreted by *O'Lone*," and found the second factor weighed in favor of the prisoner. *Id.* at 878. Regarding other opportunities to practice his faith, Wakeman declared that Brown could study the Torah in his cell and adhere to a kosher diet if he requested one. Dkt. 35, ¶ 11. Wakeman also declared that "[s]upervised Jewish studies meetings also occurred during this time period, which Mr. Brown attended." *Id.* Therefore, the only fact distinguishing Brown from the prisoner in *Ward* during the fall of 2016 is the religious studies meetings, though Wakeman's declaration does not specify how frequently these meetings took place.

Moreover, the Ninth Circuit distinguished between "a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul," reasoning that to determine potential alternative means of religious expression "findings must be made as to what is or is not forbidden by his religion." *Ward*, 1 F.3d at 878. In *Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir.

2004) ("*Henderson*"), the Ninth Circuit found the second *Turner* factor weighed in favor of a prisoner who asserted that if forced to cut his long hair, he would be considered defiled and unable to participate in the other major practices of his religion—and "thus be denied all means of religious expression." Brown asserts that like the prisoner in *Henderson* that if deprived of the opportunity to observe the Sabbath he would be "considered 'defiled' and thereafter unworthy to participate in the other major practices of Judaism." Dkt. 62 at 7.

Here, the Court finds that Brown has put forward sufficient evidence to create a question of fact as to whether he was deprived of the opportunity to observe a religious commandment—observing the Sabbath with the appropriate sacraments—which he may not violate "at peril of his soul." *Id*. Considering the additional information not before Judge Fricke as to the importance of items to sanctify the Sabbath, the Court finds the second *Turner* factor weighs in favor of Brown.

      **c.**     **Third *Turner* Factor**

Regarding the third *Turner* factor, the impact the accommodation of the asserted right will have on guards, other inmates, and prison resources, Brown argues that while he does not contest that supervision was necessary, Defendants should have been able to supervise him through staff supervision as they did for secular groups and for the Muslim faith group. Dkt. 56 at 5. In food services cases, the Ninth Circuit has credited the prison's assertion that the accommodation sought would burden prison operations, but without financial findings from the district court, the Circuit has refused to find that the burden would be sufficiently substantial for the prison to prevail on the third *Turner*

factor. *Shakur v. Schriro*, 514 F.3d 878, 887 (9th Cir. 2008) ("*Shakur*") (citing *Ward*, 1 F.3d at 878–89). Brown asserts that the religious services building had staff assigned to each floor, the windows are large, and the staff in some instances were already performing spot-checks on the Muslim group "across the hall, during the very same time frame." Dkt. 62 at 8; *see also* Dkt. 56 at 6.

The record does not show whether other small faith groups like Brown's sought staff supervision at SCCC or show any specific demonstration of the burden accommodating these groups would place on prison resources. The record shows that SCCC has had difficulty finding Jewish volunteers due to its remote location, Dkt. 36, ¶ 15, and also potentially due to Orthodox prohibitions on work and/or travel on Shabbat, Dkt. 5, ¶ 39. This raises at least the possibility that Brown's situation was relatively unique within the prison. The Court finds that though Judge Fricke appropriately credited the prison's assertion that providing Brown supervision through staff spot-checks on a permanent or indefinite basis would burden prison operations, the Court cannot find this factor weighs in favor of the prison without additional detail as to the amount of the burden.

### d. Fourth *Turner* Factor

Regarding the fourth *Turner* factor, the absence of ready alternatives as evidence of the reasonableness of the prison regulation, Brown reiterates his argument that his practice could have been accommodated through Wakeman's supervision and through guard spot checks. Dkt. 56 at 6. The alternative means of exercising the right is broad, considering whether plaintiffs are "deprived of all forms of religious exercise" and

whether, despite a lack of access to some religious observance, plaintiffs may have the ability to participate in other religious observance. *O'Lone*, 482 U.S. at 352. The court does not look for the least restrictive alternative "but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 U.S. at 136. Though the record is lacking regarding the specific burden of accommodating Brown through staff supervision, the burden would likely have "more than a negligible effect on the goals served by the regulation." *Id*.

Brown also objects that Judge Fricke's finding that he was "almost always the only inmate to attend Shabbat services at SCCC" is "misapplied." Dkt. 56 at 3 (citing Dkt. 55 at 22). Though Brown raises this objection in relation to the first *Turner* factor, the Court finds it is more relevant to the fourth. Judge Fricke correctly applied her finding to support her conclusion that DOC's decision not to hire a contract chaplain to conduct Jewish services was reasonably related to DOC's legitimate interest in appropriate allocation of financial resources. Dkt. 55 at 24. Brown argues that since Stewart's position was that "[i]nmates are now allowed to have [religious] services whether a sponsor is available or not," it does not matter how many inmates attended Shabbat services at SCCC. Dkt. 56 at 3 (citing Dkt. 47-1 at 64). Stewart made the quoted statement on June 20, 2018 in response to Brown's appeal of a grievance regarding religious services at SCCC after Brown had already been transferred to MCC. Dkt. 47-1 at 64. Stewart explained that because the chapel at SCCC had recently been relocated such that the chaplain "has a line of sight into areas where worship services are held,"

inmates were thus permitted to hold services with or without a sponsor. *Id*. That SCCC has now changed its policy raises the possibility that this change could have been accomplished while Brown was there, though without more facts the Court cannot determine whether it could have been accomplished with a *de minimis* impact.

In sum, while the Court agrees with Judge Fricke that there are compelling reasons to support Defendants' application of the "supervision unavailable" policy, the Court finds there are unresolved questions of fact as to whether Brown had a sufficient alternative means of exercising his religion and as to what impact the accommodation of his right would have had on guards, other inmates, and the allocation of prison resources. Therefore, the Court concludes that questions of fact preclude summary judgment as to the constitutional violation alleged. However, as addressed in more detail below, the Court agrees with Judge Fricke that summary judgment is warranted on qualified immunity grounds, and so adopts the R&R as modified.

### 3. Fourteenth Amendment

Judge Fricke concluded that Brown failed to show a dispute of material fact sufficient to support an equal protection claim. Dkt. 55 at 30. As Judge Fricke explained, a plaintiff may bring an equal protection claim alleging that he or she has been intentionally discriminated against based on membership in a protected class, *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), or "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

As discussed above, Judge Fricke correctly concluded that the record shows Brown, who was almost always the only Orthodox Jewish inmate present for services, was not similarly situated to the large Muslim faith group—even if the substantially larger group was granted more resources, prisons do not have to provide every religious group regardless of size a special place of worship or religious official. Dkt. 55 at 30 (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972)). Though Brown argues that DOC policy does not account for varying accommodations based on group size, every application of a policy does not have to be written to be rational. Similarly, Judge Fricke correctly concluded that Brown failed to show he was similarly situated to the secular groups identified as a lower security risk when he failed present evidence to contradict Defendants' evidence (and thus create a dispute of fact) that secular groups presented a lesser security concern. *Id.*

Brown also objects that Judge Fricke failed to consider that he was denied religious services "because of his Jewish religion." Dkt. 56 at 9. However, Brown does not cite, and the Court does not identify, any facts in the record to create a dispute of fact as to whether he was intentionally discriminated against based on his Jewish religion. *See Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001) (citing *Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977)). In sum, the Court adopts the R&R as to Brown's Fourteenth Amendment claim.

### 4. Qualified Immunity

Brown argues that because he was not provided "reasonable access to the practice of religion" on par with what was provided to other religions and on par with what was

provided to him in 2017, Judge Fricke erred in finding Defendants were entitled to qualified immunity. Dkt. 56 at 10–11 (citing *Cruz* generally). He specifically argues that during the four-month period in 2016 when he lacked community services, he could not engage in pre-Shabbat religious observance in his cell because also lacked the grape juice, matzah, and candles required for observance. *Id*. at 11.

Regarding Brown's First Amendment claim, Judge Fricke concluded that Defendants were entitled to qualified immunity even if summary judgment was not warranted because it was not clearly established that Brown had a right to "a room (separate from his cell) to observe Shabbat or similar services without the required presence of an outside community sponsor." Dkt. 55 at 31. Judge Fricke concluded that, to the contrary, multiple courts had found supervision requirements did not violate inmates' rights. *Id.* The Court agrees. Though the Court finds questions of fact on the constitutional violation by analogizing to *Shakur* on the issue of food services and *Henderson* on the issue of grooming policies, the Court does not find that these authorities render the "violative nature of particular conduct" on the facts of this case clearly established. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Regarding Brown's Fourteenth Amendment claim, Judge Fricke concluded that even if an issue of fact existed, Defendants are entitled to qualified immunity because "[n]o prior case law clearly establishes that prison officials are required to provide exactly the same accommodations to large and small religious groups alike.". Dkt. 55 at 32. The Court agrees.

Therefore, the Court adopts the R&R on qualified immunity grounds as to both the First Amendment and the Fourteenth Amendment claims.

5. *In Forma Pauperis* **Status on Appeal**

Judge Fricke found that Brown's *in forma pauperis* status should continue on appeal. Dkt. 55 at 32–33. The Court agrees with Judge Fricke.

## II. ORDER

The Court having considered the R&R, Plaintiff's objections, and the remaining record, does hereby find and order as follows:

(1) The R&R is **ADOPTED as modified**;

(2) Defendants' motion for summary judgment is **GRANTED** on qualified immunity grounds;

(3) Brown's *in forma pauperis* status shall **CONTINUE** for purposes of appeal; and

(4) The Clerk shall enter **JUDGMENT** and close this case.

Dated this 25th day of March, 2020.

_____
BENJAMIN H. SETTLE
United States District Judge